

**FILED**
MAR 0 2 2012
CLERK

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| JEFF HOTCHKISS, | ) | CIV 12-4043 |
| PLAINTIFF, | ) | |
| VS | ) | **COMPLAINT** |
| DAKOTA ENERGY COOPERATIVE, INC., | ) | |
| DEFENDANT. | ) | |

## JURISDICTION

(1) This is an employment discrimination claim arising under Title I of the Americans with Disabilities Act of 1990 ("the ADA").

(2) This Court has jurisdiction over Plaintiff's discrimination claims pursuant to 42 U.S.C. §12117 and 28 U.S.C. §§ 1331 and 1343. Venue is proper in accordance with 28 U.S.C. § 1391(b).

(3) Plaintiff Jeff Hotchkiss ("Hotchkiss") is a resident of Beadle County, South Dakota.

(4) Hotchkiss was an employee of the Defendant Dakota Energy Cooperative, Inc. ("Dakota Energy"), which is a South Dakota corporation operating in Beadle County, South Dakota.

(5) Hotchkiss timely filed his Charge of Discrimination with the South Dakota Division of Human Rights and received a Determination of Probable Cause. Thereafter, he received a Notice of Right to Sue from the EEOC dated December 19, 2011.

## COUNT ONE:
## VIOLATION OF TITLE I OF
## THE AMERICANS WITH DISABILITIES ACT of 1990
### (Employment Discrimination)

(6) In December 1990, Hotchkiss became employed as an electrician and service person for Dakota Energy. He remained employed by Dakota Energy in this position until his termination on March 31, 2011.

(7) Dakota Energy's job description for service people requires them to have a a valid South Dakota CDL. The job required Hotchkiss to drive a bucket truck to worksites in the Dakota Energy service area within South Dakota as a part of his regular job and in times of weather-related emergencies.

(8) Hotchkiss was qualified and able to perform the essential functions of his job in a manner that met his employer's expectations, including maintaining a valid South Dakota CDL.

(9) In 1999, Hotchkiss was diagnosed with Stargardt's disease, a congenital, permanent condition which substantially impairs Hotchkiss's vision.

(10) Hotchkiss wears glasses and uses bioptic lens which mitigate but do not fully correct Hotchkiss' vision limitations.

(11) Dakota Energy was aware that Hotchkiss has a visual limitation because Hotchkiss always wears glasses and has worn bioptic lens at work since December 1999.

(12)   In early 2011, Hotchkiss asked for vacation time and told his supervisor that he planned to use his vacation time to attend a program on assistive technology at the South Dakota School for the Visually Impaired.

(13)   Dakota Energy became concerned about safety and liability issues related to Hotchkiss' job when Hotchkiss stated he wanted to attend a program at the School for the Visually Impaired.

(14)   When Hotchkiss returned from his vacation, he advised his supervisor and the Dakota Energy CEO about low vision computer technology and how it could be used in the Dakota Energy workplace.

(15)   At the relevant time, Dakota Energy was promoting a paper-free work place and was assisting its employees in purchasing computers.

(16)   On March 3, 2011, Hotchkiss requested the accommodation of having visual assistive software for his workplace computer so he could use Dakota Energy's computer-based time sheets and otherwise do on-line ordering of supplies in line with Dakota Energy's move toward a paperless work environment.

(17)   On March 3, 2011, Dakota Energy requested that Hotchkiss' vision be evaluated by March 18. At that time Dakota Energy provided Hotchkiss with a copy of the physical requirements outlined in Section 391.41 of the Federal Motor Carrier Safety Regulations and represented that Dakota Energy policy mandated that Hotchkiss meet those requirements.

(18)   March 3, 2011 was the first time Dakota Energy had ever advised Hotchkiss that he was required to have anything more than a valid South Dakota CDL to perform the driving portion of his position.

(19) On March 9, 2011 Hotchkiss underwent an evaluation with a licensed optometrist who verified that Hotchkiss' vision is stable; that his vision is 20/30 with bioptics; and that he had a field of vision greater than 70 degrees.

(20) Hotchkiss provided Dakota Energy with the March 9, 2011 examination results.

(21) On March 10, 2011, Dakota Energy's CEO asked Hotchkiss if he would consider a transfer to a new position in the Member Services Department as an accommodation for his vision. Hotchkiss responded favorably to the suggestion.

(22) Dakota Energy permitted Hotchkiss to continue driving until March 17, 2011.

(23) On March 17, 2011, Dakota Energy informed Hotchkiss that he was not going to be offered a position in the Member Services Department and that Dakota Energy's Board of Directors had authorized the CEO to offer him a severance package in the event that that Hotchkiss was not in compliance with "the regulations." Hotchkiss was informed that Dakota Energy did not want him driving its trucks until the issue was resolved.

(24) On March 17, 2011, Dakota Energy scheduled another eye examination with an optometrist chosen by Dakota Energy.

(25) On March 21, 2011, Dakota Energy had Hotchkiss driven to and from the optometry appointment where he underwent testing for glaucoma, acuity and field of vision.

(26) In the late afternoon on March 24, 2011, Hotchkiss was called into a meeting with Dakota Energy and was informed that his employment was being

terminated for cause because it found that Hotchkiss' "eyesight impairment is detrimental to the effectiveness of the operations of Dakota Energy…" and that Hotchkiss failed to meet the physical requirements of his position.

(27) After Hotchkiss was fired, Dakota Energy hired a person who does not have a disability to fill his position.

(28) Hotchkiss was capable of performing the essential functions of his position with reasonable accommodations.

(29) Dakota Energy made no effort to accommodate Hotchkiss' disability.

(30) Dakota Energy's decision to terminate Hotchkiss' employment was because of its perceptions of his disability.

(31) Dakota Energy failed to enforce effective anti-discriminatory policies in the workplace in violation of Hotchkiss' federally protected employment rights.

(32) Dakota Energy's discriminatory treatment caused Hotchkiss to suffer emotional stress, humiliation and anxiety as a result of being unemployed.

(33) Dakota Energy's discriminatory treatment caused Hotchkiss to suffer lost wages, benefits and related expenses as a result of being unemployed.

(34) Dakota Energy's discriminatory treatment of Hotchkiss was willful, reckless and malicious and in intentional disregard of his federally protected employment rights.

## PRAYER FOR RELIEF

WHEREFORE, Hotchkiss prays for judgment against Dakota Energy as follows:

a. For a trial by jury on the merits of his claim;

b. For compensatory damages in such amount as the evidence at trial may show;

c. For damages, including but not limited to, those damages allowed by the Title I of the Americans with Disabilities Act and any other pertinent and applicable statute, rule or regulation, whether state or federal;

d. For punitive damages for intentional discrimination in such an amount as the evidence at trial may show;

e. For costs and disbursements incurred herein, including prejudgment interest and reasonable attorney fees, and for such other and further relief as the Court may deem just.

Dated this ___1___ day of March, 2012.

JOHNSON POCHOP LAW OFFICE

_____
Stephanie E. Pochop
P.O. Box 149
Gregory, SD  57533
Attorney for Plaintiff
(605) 835-8391